UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
UNITED STATES OF AMERICA           )
                                   )
        v.                         )     Criminal No.  14CR10276-LT
                                   )
                                   )
JOHN CRANNEY,                      )
                                   )
        Defendant.                 )
_____)

**DEFENDANT JOHN CRANNEY'S MOTION FOR RECONDERATION OF COURT'S PRETRIAL ORDER DOCKET #213 DENYING DEFENDANT'S MOTION TO PRESENT EVIDENCE OF PROMISSORY NOTES FROM NONVICTIM LENDERS**

Now comes the defendant John Cranney, by and through undersigned counsel, and hereby respectfully moves the Court, *in limine,* to reconsider its decision excluding evidence of loans made to the defendant by persons (a) who the government has not identified as "victims" in the indicted case; but (b) who lent Mr. Cranney funds pursuant to the same scheme identified in the indictment.  The government has attempted to distinguish the two groups by referring to those named in the indictment as "victims" while referring to the others as "novictims" despite the fact that they both negotiated and received the same financial bargain from Mr. Cranney.[1] See Indictment ¶ 2.    In support of this request, defendant states the following:

1.  This Court initially denied defendant's Motion in Limine which sought to introduce evidence that the "nonvictim" lenders (a) had entered into similar bargains with Mr. Cranney as the alleged "victims"; (b) been given similar promissory notes as the alleged "victims"; (c) will

---

[1] The defense refers to these two groups using the government's terms "victims" and "nonvictims" for clarity sake.  The defense sees these groups as one which have been artificially split up because the "victims' accepted the government's narrative while the "nonvictims" did not.

1

testify, unlike some of the alleged "victims", that the promissory accurately reflect their agreement with Mr. Cranney; and (d) will testify that Mr. Cranney did not represent to them that the loans were being invested in the stock market or were in some investment account. Essentially, defendant was seeking to introduce evidence that the "nonvictims" provided funds to Mr. Cranney in the same manner and purpose as the alleged "victims." See Docket # 202 (Order) and Docket # 155 (Motion in Limine). After the Court denied his motion, defendant filed a Motion to Clarify because there was some doubt as to whether the ruling prohibited defendant from introducing the "nonvictim" promissory notes, which were part of the same scheme.[2] This Court issued the following order:

> The court clarifies its Electronic Order [#202] as follows. Non-victim clients may testify to their transfer of money to, and receipt of money from, the defendant or other entity related to the defendant. They may not testify as to their own understanding of defendant's business or practices, and defendant may not offer their testimony or other evidence as to what defendant stated to them. The court encourages the parties to reach a stipulation as proposed by the government in its 211 Response.

Docket # 213.

    2. The defendant now requests that the Court reconsider its ruling for the following reasons:

    a. The defendant is accused of using, amongst other inducements, promissory notes to deceive individuals to give him money. The government has included in the Indictment only those lenders that blame Mr. Cranney directly for their financial losses[3] suffered after Shaklee

---

[2] Scheme does not connote a criminal enterprise but simply a plan or business objective.
[3] It should be emphasized that most note holders suffered losses once the law suits were filed in 2012 by individual lenders and Massachusetts Secretary of State filed a complaint and alleged a Ponzi scheme. Courts froze Mr. Cranney's assets, Shaklee revoked his distributorships (taking away his income) and he was forced into bankruptcy. Almost all note holders, regardless of how the government classifies them, suffered losses as a result.

2

Inc. revoked his distributorships and forced him into bankruptcy. The government successfully convinced this Court to restrict evidence at trial to the government's evidence of alleged false misrepresentations to those lenders identified as victims, while denying the defense the opportunity to present "nonvictims" from the same scheme to (a) rebut those accusations; and (b) show that the "nonvictims" were given a similar bargain or promissory note as the alleged victims but do not alleged any misfeasance on the part of Mr. Cranney. The Court has also precluded Mr. Cranney's defense from introducing the actual promissory notes provided by Mr. Cranney to "nonvictims" while permitting the government to introduce the notes provided to the alleged "victims" despite the fact that the terms for both sets of notes ("nonvictims" and alleged "victims") are consistent throughout the financial scheme.

      b. The claims of fraud by the alleged "victims" predominantly arise from oral representations allegedly made by Mr. Cranney to induce lenders to participate in the scheme. Mr. Cranney seeks to present evidence from other lenders, who also lost money in the same scheme, that they were not induced to participate through false representations despite negotiating and entering into almost identical financial agreements with Mr. Cranney. The purpose of this evidence is to demonstrate that Mr. Cranney was consistent in his financial negotiations and agreements throughout and that, unlike the "nonvictim" lenders, the alleged "victims" are not only blaming Mr. Cranney for their losses, but are so angry with him that they are willing to distort or convert Mr. Cranney's prior oral representations into alleged misrepresentations.[4] The defense seeks to present a significant number of "nonvictim" promissory noteholders for this purpose.

---

[4] The fact that most of the material misrepresentations alleged are in oral form is a critical distinction from most cases. It is extremely difficult to disprove an oral allegation except to show that others, similarly situated, were not the victim of such oral misrepresentations. While

3

      c.    Ultimately, the defense expects the evidence to show that Mr. Cranney made the same representations to all funders (government and defense witnesses alike) with the only difference being that some funders are willing to accept the government's narrative that Mr. Cranney defrauded them while others, similarly situated, reject that narrative. This evidence is critical to Mr. Cranney's defense.

      d.    Given that Mr. Cranney treated all the lenders similarly, i.e. providing all 36 with promissory notes with similar terms, it would be logically inconsistent and unfair for the Court to exclude the defense from introducing the "nonvictim" promissory notes while permitting the government to introduce the promissory notes for the alleged "victims." This is especially true given that the "nonvictims" are alleged to have provided loans to Mr. Cranney as part of the same scheme involving the alleged "victims." Again, the only distinction between these two groups is that Mr. Cranney's witnesses have rejected the government's theory of prosecution while the alleged "victims" have embraced it. This distinction is the core of Mr. Cranney's defense and is compelling given that most of the misrepresentations alleged are oral, unrecorded and subject to manipulation by a group of witnesses who have motive to seek retribution for the financial losses incurred when Mr. Cranney could not repay the loans.[5]

      e.    Mr. Cranney has a Sixth Amendment right to present an effective defense. The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-

---

evidence of bias, i.e., financial losses might explain the motive for lying, it does not serve to impeach those casting the stone. The existence of others similarly situated, who say exactly the opposite, is a powerful tool, however, to impeach the credibility of the other noteholder's. This Court's exclusion of the defense witnesses from testifying about the nature of these loans undermines Mr. Cranney's ability to effectively, or even adequately, impeach the alleged "victim," noteholders.

[5] It is interesting to note that many of Mr. Cranney's witnesses suffered financial hardships also but have rejected the path offered by the government.

4

examine adverse witnesses in order to test their credibility and the truth of their testimony. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105 (1974)  This is only feasible if Mr. Cranney can present evidence demonstrating that he negotiated virtually identical bargains with all lenders. The defense proposes that it be permitted to elicit the following information from all note holders, who lent Mr. Cranney money as part of the same business scheme or operation, not just those embracing the prosecution's narrative:

- That they lent Mr. Cranney a specific amount of money and received a promissory note in return, which would be admitted as an Exhibit.
- Mr. Cranney paid them a specific amount of money back, which satisfied some portion of the debt.
- Mr. Cranney provided them with an accounting of the money they lent him and showed the interest/principle owed to date.
- The promissory note was an accurate reflection of the bargain the note holders negotiated with Mr. Cranney.
- Mr. Cranney did not state how he would use the proceeds.

   3. This evidence is relevant to the allegations by the government that Mr. Cranney defrauded the alleged victims in this case because it tends to prove that he negotiated identical bargains with all note holders and did not deviate from his custom in doing so.  The terms negotiated with one group of lenders is relevant for proving that he did not deviate from that custom in negotiating with the other group of note holders.    *See* Fed. R. Evid. 406; 1 *McCormick on Evidence* § 198 ("Evidence concerning other contracts or business dealings may be relevant to prove the terms of a contract, the meaning of these terms, a business habit or custom.)

   4. Ultimately, Mr. Cranney seeks the opportunity to show that he dealt with the alleged victims in the same manner that he treated other lenders who are on his witness list.  The

5

defense witnesses will testify that they engaged in negotiations with Mr. Cranney during the period of the alleged scheme to loan him money with advantageous rates of return. Mr. Cranney provided lenders with promissory notes acknowledging receipt of funds and specifying the terms of the loan. Some witnesses will testify that they received monthly payments and/or lump sums while others received no payments because no money was due until the end of the loan's term.[6] Defense witnesses are expected to testify that Mr. Cranney did not represent to them he was investing their money in the stock market or holding it in traditional accounts to earn interest. They are expected to testify, instead, that there were no limitations on how he could use the funds from these loans.

     5. The other trait that the "victim" lenders had in common with the "nonvictim" lenders is that most suffered financial losses after Mr. Cranney was forced into bankruptcy. Despite this misfortune, the majority of noteholders do not consider themselves "victims" as they understand that Mr. Cranney's financial ruin resulted from an unfortunate confluence of circumstances and not from some scheme to deceive.

     The evidence relating to "nonvictim" loans is admissible to show that Mr. Cranney had a customary and consistent pattern in negotiating the terms and bargain of each loan for all his lenders. This is critical to his defense as it will prove that the "victims'" allegations that he induced them with false misrepresentations to give him money are inconsistent with his treatment of other similarly situated lenders. See also *Finch v. Gen. Elec. Capital Corp.*, No. CIV 95-1210, 1999 WL 234680, at *1 (D.N.M. Feb. 10, 1999) ("Defendants began a consistent pattern of requiring any dealer wishing to continue to receive inventory financing to sign the

---

[6] It is expected that witnesses will testify that Mr. Cranney lost his source of income in 2012 after suits were filed and Shaklee Corp. revoked his distributorships. Mr. Cranney was unable to repay these notes and went in bankruptcy.

1984 agreement. Evidence of that pattern is classic Rule 406 evidence."); *Zola v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 84 Civ. 8522-CSH, 1985 WL 94, at *1 (S.D.N.Y. May 28, 1985) (admitting evidence that it was defendant's practice and procedure to require customers to sign an agreement before opening and maintaining margin account to show that plaintiff did sign such an agreement)

      Again, the "nonvictim" lender testimony and evidence is critical to Mr. Cranney's defense. Since the Indictment defines the fraud scheme as encompassing the period from 2001 through 2012 and involving "others" outside the indictment, the defense must be able to present those "other" lenders to prove that the alleged "victim's" accusations are distorted or false and that Mr. Cranney's business arrangement with them was legitimate and legal. Otherwise, the playing field between the parties will not be level and Mr. Cranney' right to present an adequate and effective defense will be undermined in violation of his due process rights. See Fifth Amendment.

      Wherefore, defendant moves this Court to reconsider its original ruling and grant his Motion.

                                     Respectfully Submitted,

/s/JAMES BUDREAU
James Budreau
BBO# 553391
Bassil & Budreau
20 Park Plaza, Suite 1005
Boston, MA 02116
617-366-2200

CERTIFICATE OF SERVICE

I, James Budreau, do hereby certify that this motion has been filed electronically and that it will be served electronically to registered ECF participants as identified on the Notice of Electronic Filing (NEF) on July 15, 2017.

/s/ James Budreau
James Budreau