UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 14-cr-10276-IT |
| | * | |
| JOHN CRANNEY, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

August 9, 2018

TALWANI, D.J.

At the conclusion of a two-week trial, a jury found John Cranney guilty on three counts

of wire fraud in violation of 18 U.S.C. § 1343, twelve counts of mail fraud in violation of 18

U.S.C. § 1341, and three counts of money laundering in violation of 18 U.S.C. § 1957. The jury

found Cranney not guilty as to one count of wire fraud. Before the court is Cranney's Motion for

Judgment of Acquittal [#482], as amended,[1] which argues the evidence was insufficient to

convict Cranney of the mail fraud alleged in Counts Eleven, Twelve, Fourteen, Fifteen, Eighteen,

and Nineteen, and money laundering alleged in Count Twenty-One, of the Indictment. For the

reasons that follow, the Motion for Judgment of Acquittal [#482] is DENIED.[2]

I.      Rule 29 Motion for Judgment of Acquittal Standard

Cranney moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure

29(a) at the close of the government's evidence. The court reserved decision on the motion until

---

[1] The court allowed Cranney to amend his original Motion for Judgment of Acquittal [#482] to
include Count 18, which had been inadvertently omitted from the original motion. See Assented
to Motion to Amend Motion for Acquittal [#485]; Electronic Order [#501].

[2] In an Electronic Order [#512] entered August 6, 2018, the court denied the Motion for
Judgment of Acquittal [#482] and stated that this Memorandum would follow.

after the jury returned its verdict. While the court must "decide the motion on the basis of the evidence at the time the ruling was reserved," Fed. R. Crim. P. 29(b), Cranney rested without putting on evidence of his own. Thus, the evidence that the court must consider in deciding this motion is coextensive with the evidence presented at trial.

In deciding the motion for judgment of acquittal, this court must "resolve all credibility disputes in the verdict's favor," United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine the evidence – direct and circumstantial – as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict," United States v. Meléndez-González, 892 F.3d 9, 17 (1st Cir. 2018) (quoting United States v. Wyatt, 561 F.3d 49, 54 (1st Cir. 2009)). Viewing the evidence in such a light, the court's role is to determine whether "a rational fact finder could conclude beyond a reasonable doubt that the defendant committed the charged crime." Id.

II.    Discussion

To convict Cranney of mail fraud under 18 U.S.C. § 1341, the government was required to prove: "(1) a scheme to defraud based on false pretenses; (2) [Cranney's] knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail communications in furtherance of that scheme." United States v. Tavares, 844 F.3d 46, 58 (1st Cir. 2016) (quoting United States v. Hebshie, 549 F.3d 30, 35-36 (1st Cir. 2008)). Further, "[a] material falsehood must be proven to convict a defendant of mail . . . fraud." United States v. Godfrey, 787 F.3d 72, 78 (1st Cir. 2015). For the money laundering conviction under 18 U.S.C. § 1957, the government was required to prove Cranney "knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a).

Cranney argues that he should be acquitted on the mail fraud counts that are based on mailings to or from Elizabeth Sutton (Counts Eleven, Twelve, Fourteen, and Eighteen), Mary Jo Ewing (Count Fifteen), and Richard Pochepan (Count Nineteen) on the ground that there was insufficient evidence to show he defrauded these individuals. Cranney also argues that if there was insufficient evidence to convict on Count Eleven, the same is true with respect to the money laundering charged in Count Twenty-One, because the specified unlawful activity alleged in Count Twenty-One is the mail fraud in Count Eleven.

As an initial matter, a conviction for mail fraud under 18 U.S.C. § 1341 does not require the government "to establish that the intended victim was *actually* defrauded." United States v. Allard, 926 F.2d 1237, 1242 (1st Cir. 1991). That is, mail fraud does not require the government to prove that another person detrimentally relied upon the defendant's misrepresentations. See Neder v. United States, 527 U.S. 1, 24-25 (1999). "The relevant inquiry is whether there was an intent to mislead the victim by inducing an uninformed consent to part with money or property." Allard, 926 F.2d at 1242. To the extent Cranney argues that Sutton, Ewing, and Pochepan were not actually defrauded, this argument is insufficient to warrant a judgment of acquittal on the counts at issue. That said, Cranney's Motion for Judgment of Acquittal can be understood to argue that the government's evidence was insufficient to show that Cranney had a scheme to defraud these three individuals or to show that he made any material false statements to induce them to transfer their money. It is on this theory that the court proceeds to evaluate the merits of Cranney's arguments for acquittal.[3]

---

[3] Cranney does not argue that the mailings underlying these mail fraud counts were not "in furtherance" of a scheme to defraud. Instead, in arguing that the above-named individuals were not defrauded, Cranney contends that there was no scheme to defraud in the first place. In any event, for the reasons articulated in the following sections, insofar as the evidence was sufficient to support a finding that there was a scheme to defraud, it was also sufficient to support a finding that the mailings underlying the challenged counts were in furtherance of the scheme.

a. *Cranney's Entities*

Viewed in the light most favorable to the verdict, the evidence demonstrated that Cranney created entities to receive funds that he solicited from others. One such entity was Cranney Capital I LLC, which Cranney characterized as a qualified retirement plan into which individuals could rollover funds from already existing individual retirement accounts and 401(k) retirement accounts without incurring tax penalties. Cranney called Cranney Capital I LLC an Employee Stock Ownership Trust, but Cranney did not limit participation in the entity to Cranney Capital I LLC employees. In a letter to his attorney who helped him establish the Cranney Capital I LLC entity, Cranney stated that he wanted to use this name, with a roman numeral, because "[t]his is what some of the major hedge funds do and it will make it more flexible for stationary and general reference." Trial Exhibit ("Ex.") 141. Cranney also wrote that this naming would allow him to easily add more entities later. Cranney later formed a separate entity named Cranney Capital III to receive monies from sources other than retirement accounts. Cranney described Cranney Capital III in filings with the Commonwealth of Massachusetts as being in the business of "investment management." Ex. 171.

b. *Promissory Notes*

Cranney sent Elizabeth Sutton, Mary Jo Ewing, and Richard Pochepan "Promissory Notes" after they transferred money to one of his entities. These "Promissory Notes" stated that the funds transferred to Cranney Capital I or Cranney Capital III were a loan from the individual (or in some cases, the couple), that the transferor's right to withdraw funds was limited for a specified period of time, and that a guaranteed interest rate would be paid on the money transferred. Cranney contends that these "Promissory Notes" show that individuals who transferred money to Cranney through his entities were aware that their transfers were "loans"

4

rather than "investments." Cranney supports this argument by pointing to affidavits filed during Cranney's bankruptcy proceedings by Richard Pochepan and family members of the deceased Elizabeth Sutton and Mary Jo Ewing characterizing transfers to Cranney entities as loans.

The government does not dispute that Elizabeth Sutton, Mary Jo Ewing, and Richard Pochepan received these "Promissory Notes," but argues that they were simply Cranney's fraud scheme in motion. Schemes using fraudulent promissory notes certainly can support mail fraud convictions. See, e.g., United States v. Castaldi, 743 F.3d 589, 592 (7th Cir. 2014) (describing mail fraud scheme whereby promissory notes were used to make fraudulent promises of annual interest); United States v. Harris, 185 F.3d 999, 1006 (9th Cir. 1999) (affirming mail fraud conviction where defendant "purposely took the money from the pension plan, and gave the plan promissory notes unlikely ever to be paid, knowing they were unlikely ever to be paid, so that he could use the money instead of leaving it for his employees' retirements"); United States v. Brewer, 807 F.2d 895, 897 (11th Cir. 1987) (describing fraudulent promissory notes providing victims with false promises of repayment to lull victims into false sense of security).

Ultimately, Cranney's focus on the "Promissory Notes" – and on whether the transfers of money to Cranney's entities were "loans" – misses the point. If, after representing that transferred funds would be invested, Cranney issued "Promissory Notes" from the Cranney entities knowing that he was going to use the transferred funds to pay off his personal debts and intending to induce individuals either to transfer more money to the Cranney entities, or to lull those individuals into a false sense of security that their transfers were secured by a note so that they would not report Cranney's conduct to law enforcement, the notes were part of the scheme to defraud. What matters, then, is what representations Cranney made, if any, regarding what he

was going to *do* with money that was transferred to his entities, and whether he made such representations with the intent to defraud. The following sections address these critical issues.

      c. *Elizabeth Sutton (Counts Eleven, Twelve, Fourteen, Eighteen, and Twenty-One)*

Cranney's scheme to defraud Elizabeth Sutton in connection with the transfer of funds to Cranney Capital III is the subject of the mail fraud charged in Counts Eleven, Twelve, Fourteen, and Eighteen, and the money laundering charged in Count Twenty-One. Elizabeth Sutton died prior to trial. The government's evidence that Cranney engaged in a scheme to defraud Elizabeth Sutton was based on numerous documents as well as on the testimony of her husband, Jerry Sutton, and that of Paul LaGris, a friend of both Cranney's and Elizabeth Sutton's.[4]

Jerry Sutton testified as follows. He was introduced to Cranney through Elizabeth Sutton. Elizabeth Sutton was a distributor for the Shaklee Corporation, which manufactures and distributes nutritional products through independent distributors. Cranney was a prominent distributor for Shaklee, and Shaklee promoted Cranney as one of its most successful distributors.

Trial evidence shows the Suttons were transferring money to Cranney Capital III by March 2006. A March 8, 2006, letter from Cranney to the Suttons acknowledges receipt "by Cranney Capital III" of a $10,000.00 check and states interest "will be paid on the loan at the rate of prime plus two percent simple interest." Ex. 475. A January 10, 2007, check from the Suttons' joint account was written to Cranney Capital III in the amount of $10,000.00. Ex. 477. A June 8, 2007, letter from Cranney to Jerry Sutton attached four separate promissory notes between Jerry Sutton as "lender" and Cranney Capital III as "borrower." Ex. 484.

---

[4] Prior to trial, the court allowed the government's unopposed <u>Motion for Pre-Trial Deposition</u> [#126] pursuant to Federal Rule of Criminal Procedure 15. <u>See</u> <u>Electronic Order</u> [#129]. Portions of Jerry Sutton's video deposition were played on days 7 and 9 of trial. The court also allowed the government's unopposed <u>Amended Motion to Take Deposition</u> [#405] of Paul LaGris under Rule 15. <u>See</u> <u>Electronic Order</u> [#406]. Portions of Paul LaGris' video deposition were played on days 5 and 6 of trial.

Sometime prior to 2008, Jerry and Elizabeth Sutton stayed at Cranney's home. In the course of their stay, Cranney hosted a meeting with the Suttons, Paul LaGris, and LaGris' wife. Cranney held the meeting in his home office, where multiple computer monitors were on display. Cranney told those in attendance that he used these screens to track the stock market. Jerry Sutton testified that Cranney explained "how he was investing the money that he – that Liz had given – or loaned him, how he was making money, and he could pay better interest rates than we were getting from the company that we had at home." Further, Cranney explained that "he could tell where to invest the money, and that was kind of the way it was. He could make – make more than we were getting and that's why he could give us prime rate." Elizabeth Sutton was in the room when Cranney made these statements. At the time, Jerry Sutton understood Cranney to be using Cranney Capital III "to develop the money – he could invest that money that we were loaning him to invest in this program that he had set up." On cross-examination, defense counsel asked Jerry Sutton whether Cranney said that the money transferred to Cranney Capital III was a loan, to which Jerry responded that it was "for investment purposes."

Jerry Sutton further testified that he overheard Paul LaGris ask Cranney how he would pay interest rates on the money that was transferred to his entities. Cranney told LaGris he would "use the stock market to make money for the investment." Jerry Sutton later asked LaGris whether he was going to invest in Cranney Capital III, and LaGris responded in the affirmative. Elizabeth Sutton was present for this conversation between her husband and LaGris. According to LaGris, Elizabeth Sutton asked LaGris whether he was investing with Cranney while they were standing in Cranney's kitchen one morning, and LaGris said that yes, he was investing with Cranney. Elizabeth Sutton later transferred money from the Elizabeth C. Weekley Trust (which, as Jerry Sutton explained during his testimony, used Elizabeth Sutton's name from her prior

marriage, "Weekley") to Cranney Capital III, and Cranney paid LaGris commissions based on the amounts of money he received from Elizabeth Sutton.

A February 2, 2009, letter from Cranney to Jerry Sutton stated that "Liz requested a current statement as to the monies you have with Cranney Capital III." Attached to this letter were documents providing cash flow data and an amortization schedule for amounts labeled as loans from Elizabeth Weekley's trust to Cranney Capital III. Ex. 487.

The mail fraud counts pertaining to Elizabeth Sutton involve the following mailings that occurred between March 2010 and September 2011. A March 5, 2010, check from "Elizabeth C. Weekley Trust" to "Cranney Cap III" for $100,000, see Ex. 488, is the subject of the mail fraud charged in Count Eleven. March 23 and 24, 2010, checks from "Elizabeth C. Weekley Trust" to "Cranney Cap III" for $30,000 and $100,000, see Ex. 489, are the subjects of Count Twelve. December 15, 2010, checks from "Elizabeth C. Weekley Trust" to "Cranney Cap III" for $20,000 and $50,000, see Ex. 490, are the subjects of Count Fourteen. A September 12, 2011, check from "Elizabeth Weekley Sutton" to "Cranney Corp. III" for $15,000, and two September 19, 2011, checks from "Elizabeth C. Weekley Trust" to "Cranney Corp. III" for $50,000 and $35,000, see Ex. 491, are the subjects of Count Eighteen.

A trial, the government introduced cash flow charts showing the funds available in various Cranney accounts on certain dates following the deposits of checks into the Cranney Capital III, Inc., account. Those charts, which are based on account statements, show that prior to cash infusions derived from deposits of participants' checks, Cranney's accounts had low balances. When deposits were made into the Cranney Capital III, Inc., account, funds were quickly transferred first to "Cranney Industries, Inc.," accounts, and then to Cranney's personal bank accounts, as well as those belonging to Cranney's son. See, e.g., Ex. 290.10, 290.15.

This evidence shows, for example, that on March 7, 2010, the Cranney Capital III account had a balance of $821.68. On March 8, 2010, the balance of the first Cranney Industries, Inc., account was $46.88. That same day, the balance of the second Cranney Industries, Inc., account was -$96.41. After Elizabeth Sutton's $100,000 check was deposited into the Cranney Capital III, Inc., bank account on March 8, 2010, Cranney transferred most of this money to one Cranney Industries, Inc., account, then quickly moved most of the money into the other Cranney Industries, Inc., account. On March 10, 2010, Cranney transferred $10,000 from his second Cranney Industries, Inc., account to his personal account, and on that same day transferred $50,342.00 to his son's personal bank account. See Ex. 290.10. The evidence further shows that after $130,000 from Elizabeth Sutton was deposited into Cranney Capital III, Inc., on March 25, 2010, Cranney made two transfers totaling $103,000 into one Cranney Industries, Inc., account, and then moved most of this to his second Cranney Industries, Inc., account. Between March 26, 2010, and March 30, 2010, Cranney transferred $18,500 from his second Cranney Industries, Inc., account into his personal account and $68,024.35 from that Cranney Industries, Inc., account into his son's personal account. See Ex. 290.10.

As further evidence of the scheme to defraud Elizabeth Sutton, the government introduced evidence that Cranney was paying Paul LaGris commissions for each Sutton "investment" in Cranney Capital III. Paul LaGris testified that Cranney reimbursed LaGris and his wife for expenses they incurred while working for Cranney's Shaklee distributorships, such as traveling to annual Shaklee conferences. Cranney also paid LaGris "commissions" for work unrelated to Shaklee. This work involved communicating with Elizabeth Sutton, whom Cranney described to LaGris as a woman who wanted to invest with Cranney. LaGris' assignment was to call Elizabeth Sutton on a regular basis to maintain a positive relationship so that she would

continue communicating with Cranney. A March 10, 2012, letter from LaGris to Cranney, in

which LaGris requested repayment of his accounts with Cranney, stated the following:

> Our Commissions & Bonus (A) account where beginning April 20,
> 2006 you asked us to assist you in communicating with Shaklee
> people who were also investing in your fund: ES; VD; GS. The
> accounting here is based on a 7% Commission & Bonus you offered
> us for each new investment, i.e. $50K we earned $3,500 which you
> paid us out of the new investments.

See Ex. 346. LaGris stated that he used the word "commission" because this was the

characterization Cranney used. Attached to the letter was an accounting of commissions LaGris

earned from Cranney, primarily from Elizabeth Sutton's money transfers to Cranney Capital III

between April 20, 2006, and July 29, 2011. LaGris testified that he created the document, but

acknowledged that he did so long after many of the commissions were earned.

The government introduced checks sent from Cranney Capital III, Inc., to LaGris. One

written to "LaGris Associates" for $7,000.00, dated October 15, 2006, states that it is for "Sutton

– 100K @ 7%." Another check for $2800.00 on the same date states "Sutton – 40K @ 7%." A

$2100.00 check dated January 19, 2007, written to Paul LaGris, is for "7% of 30,000 Sutton."

Some checks from Cranney to LaGris state vaguely that they are for a "commission." Similar

checks referring to Sutton commissions were paid to LaGris' wife.

Cranney argues the government failed to prove beyond a reasonable doubt that Elizabeth

Sutton's payments to Cranney Capital III – specifically, the four checks at issue in Counts

Eleven, Twelve, Fourteen, and Eighteen – were the product of fraud rather than genuine loans

from Elizabeth to Cranney. The government acknowledges that both Suttons received

promissory notes after they transferred money to Cranney Capital III. Further, Jerry Sutton

testified that he classified his transfers to Cranney as "loans" in the course of bankruptcy

proceedings. Jerry Sutton also referred at times in the course of his testimony to his "lending"

money to Cranney, and to Cranney paying "interest rates" on the funds transferred to Cranney Capital III. But Jerry Sutton also consistently testified that Cranney represented that the money that was transferred to Cranney Capital III was being invested in the stock market, which would enable Cranney to provide the returns that he was promising to those who transferred money.

Despite the promissory notes received after each transfer and Jerry Sutton's references to loans and interest rates, a rational jury could find based on the evidence presented at trial that the government had proven beyond a reasonable doubt that Elizabeth Sutton transferred money to Cranney Capital III – whether characterized as a loan or investment – after Cranney falsely represented to her that he would invest the money in the stock market to provide better returns than she would receive by investing the money elsewhere. Further, the testimony regarding Cranney's statements to Elizabeth Sutton during the meeting in Cranney's home office, in which he told both the Suttons and LaGrises that the money Elizabeth Sutton had transferred to him previously was invested in the stock market and purported to show how that money was performing in the stock market, allowed the jury to conclude that Cranney made material misrepresentations that induced Elizabeth Sutton to transfer more money to Cranney Capital III.

Cranney conveyed to Elizabeth Sutton that if she transferred her money to Cranney Capital III, she could obtain a higher return than was available elsewhere. This was false, and Cranney knew it. Funds transferred to Cranney Capital III were never going to provide the returns Cranney promised. The evidence at trial showed that Cranney did not invest money that Sutton transferred to Cranney Capital III in the stock market. Instead, he quickly transferred that money from the Cranney Capital III account, through multiple Cranney Industries accounts, and ultimately into Cranney's personal bank accounts or those of his family members. Once in these accounts, the evidence showed, the funds were used to pay personal expenses, including credit

card bills and mortgage payments. Thus, Cranney misrepresented what he would do with the transferred funds, and it was reasonable for the jury to conclude that this misrepresentation had a tendency to influence Elizabeth Sutton to transfer money to Cranney Capital III.

Most importantly, Cranney used the official-sounding entity, Cranney Capital III, to convince Elizabeth Sutton that her funds would be invested. The use of the Cranney Capital III name, which appeared on all relevant correspondence between both Cranney and the Suttons, provided the appearance that Sutton's money would be part of a legitimate fund. Cranney also falsely represented that he would be acting as "trustee" of that fund. In reality, the government's evidence showed that Cranney was using the Cranney Capital III entity as a mechanism to take Sutton's funds. Those funds were then quickly transferred to other Cranney accounts, and ultimately used to pay Cranney's personal expenses. Further, Cranney did not create any mechanism to account for money transferred from Cranney Capital III into Cranney's accounts. Cranney Capital III did not loan money to Cranney, or "invest" in Cranney's businesses. Instead, Cranney simply helped himself to the money Sutton invested in Cranney Capital III.

Further supporting the jury's verdict as to the fraud counts involving Elizabeth Sutton was the testimony of Paul LaGris that he was paid a commission for each of Elizabeth Sutton's investments with Cranney. There are two ways to interpret LaGris' testimony. In one version, LaGris understood that Cranney was misrepresenting what he was doing with the money that was transferred to him, and assisted Cranney in carrying out the scheme by convincing the Suttons to transfer their funds. In an alternative version, which is in line with LaGris' testimony, Cranney defrauded LaGris into believing that Cranney was investing money in the stock market on behalf of those who transferred money to him, and then paid LaGris to convince others to transfer funds to Cranney's entities. Regardless of which of these views of LaGris' testimony the

jury adopted, Cranney was using LaGris to spread misrepresentations about what happened to money that was transferred to Cranney's entities after the transfers. "[T]he jury is not required to agree on the means – the specific false statement – [Cranney] used to carry out [his] fraudulent scheme." United States v. LaPlante, 714 F.3d 641, 647 (1st Cir. 2013).

As a final matter, Cranney argues that Count Twenty-One must be dismissed, because the specified unlawful activity for this money laundering count is the mail fraud alleged in Count Eleven. This depends entirely on Cranney's arguments as to Count Eleven. Because there was sufficient evidence to support a guilty verdict on the mail fraud charged in Count Eleven, and because Cranney advances no other argument for acquittal on Count Twenty-One, Cranney's motion for judgment of acquittal as to Count Twenty-One is denied as well.

> d. *Mary Jo Ewing (Count Fifteen)*

Next, Cranney argues that there was insufficient evidence for the jury to conclude that he engaged in a scheme to defraud Mary Jo Ewing. Cranney also argues that he did not make any material misrepresentations to Mary Jo Ewing to induce her to transfer money to him.

Like Elizabeth Sutton, Mary Jo Ewing died prior to trial. Mary Jo Ewing's son, Rory Ewing, testified at trial that he and his mother were distributors for Shaklee in California and that he has known Cranney for more than twenty years through his mother's involvement with Shaklee. Rory Ewing assisted his mother with managing her retirement funds. During a national Shaklee conference, Cranney suggested to Rory and Mary Jo Ewing that they invest with him and stated that others who had invested with him were enjoying great returns.

Rory Ewing communicated with Cranney about the possibility that his mother would invest her retirement accounts in one of Cranney's entities. He informed Cranney that the funds his mother was investing with Cranney needed to be kept safe, because Mary Jo Ewing had

Parkinson's disease and depended upon distributions from her retirement accounts to pay for her

treatments. Rory Ewing further stated that he wanted to ensure that the plan established with

Cranney would be a qualified retirement plan, because Mary Jo Ewing was transferring funds

already in a qualified retirement plan and did not want to incur negative tax consequences from

her transfer.

Eventually, Cranney came to the Ewings' office and provided a document titled

"Qualified Plan Transfer Request Letter," which listed Cranney as the "Trustee/Custodian" of

the Qualified Retirement Plan/Individual Retirement Account that was to be established with

Cranney Capital I LLC Employee Stock Ownership Trust. Cranney signed his name under the

following statement: "Cranney Capital I, LLC Employee Stock Ownership Trust hereby accepts

from your custodianship the above requested transfer of assets for the qualified plan account

established for the above named participant." Ex. 598. Rory Ewing testified that Cranney stated

that the plan that was to be established with Cranney Capital I would be a qualified retirement

plan. Cranney told Rory Ewing that the funds would be safe with him, and there would be no

need to worry, as other people had invested with Cranney for a long time and had not

experienced any problems. After these assurances, Rory Ewing facilitated the transfer of his

mother's funds to Cranney Capital I LLC.

The government introduced a summary chart showing a deposit of $701,463.63 from

Mary Jo Ewing, a deposit of $49,255.67 from Mary Jo Ewing, and a deposit of $33,744.60 from

Rory Ewing into a Cranney Capital I, LLC Employee Stock Option Trust account on January 2,

2009. See Ex. 290.12. The balance in the Cranney Capital I, LLC Employee Stock Option Trust

account the prior day was $890.99. Id. After the January 2 deposits, Cranney made four transfers

to a Cranney Capital I, LLC account. Id. From this account, Cranney made multiple transfers to

14

his Cranney Industries, Inc., accounts. Ultimately, Cranney transferred from these Cranney Industries, Inc., accounts $20,000 to his personal bank account on January 5, 2009; $10,000 to his personal account on January 6; $200,000 to his personal account on January 14; and $350,000 to his personal account on April 15. Id. In the period immediately following the January 2 deposits from Mary Jo Ewing, Cranney also issued several checks to repay others who had transferred funds to Cranney Capital I LLC, Employee Stock Option Trust.

After Mary Jo Ewing's funds were transferred to Cranney Capital I LLC Employee Stock Ownership Trust, Cranney provided the first year's minimum required distribution in the form of a December 17, 2010, $33,463.00 check, on which Count 15 is based. See Ex. 201.11, Ex. 311.[5] This check was written from "Cranney Capital I LLC Employee Stock Ownership Trust," with "J.W. Cranney" appearing on the "authorized signature" line. Id. After this first distribution, however, Cranney failed to provide the minimum required distributions, despite numerous communications from Rory Ewing requesting payment of those distributions.

As with the Suttons, the Ewings received promissory notes after they transferred funds. These promissory notes appeared on Cranney Capital I LLC letterhead. Rory Ewing testified that prior to Cranney sending a promissory note from Cranney Capital I LLC, Cranney had not asked for a loan or referred to the transfer of funds as a loan. Cranney never informed Rory Ewing prior to the transfer of money to Cranney Capital I LLC that this would be a loan. Rory Ewing believed Cranney would be investing Mary Jo Ewing's money in the stock market. According to Rory Ewing, he would not have invested his mother's retirement funds with Cranney Capital I LLC had he been told it was a loan. Also like the Suttons, Rory Ewing filed an affidavit with the

---

[5] Pursuant to federal law, certain qualified retirement plans must make a "minimum required distribution" from the plan to the payee each year after the payee reaches a certain age, and failure to take the minimum required distribution results in tax penalties. See, e.g., 26 U.S.C. § 4974; 6 Mertens Law of Fed. Income Tax'n § 25C:17 (required minimum distribution).

bankruptcy court asserting that the transferred funds were loans. He explained this affidavit as based on the advice of a bankruptcy attorney.

Rory Ewing testified that he could not "say with 100 percent certainty" that his mother did not have conversations with Cranney on her own about the transfer of funds. But he did not believe his mother had such conversations, because they worked together in the same office and had a relationship in which they spoke often. Cranney argues that, based on this lack of certainty about whether Mary Jo Ewing independently negotiated with Cranney regarding the transfer of her funds, the jury could not conclude beyond a reasonable doubt that Mary Jo was defrauded.

Cranney's argument fails on several levels. First, the jury was entitled to conclude based on Rory Ewing's testimony that Mary Jo Ewing did not independently negotiate with Cranney. The remote and unlikely possibility that Mary Jo Ewing negotiated with Cranney does not rise to the level of reasonable doubt requiring acquittal. See United States v. Gerhard, 615 F.3d 7, 28 (1st Cir. 2010) (no error in instruction stating that "reasonable doubt is not some possible or imaginary doubt" (internal quotation omitted)). Second, even assuming Mary Jo Ewing communicated with Cranney to negotiate the transfer of funds, this would not change the testimony regarding the misrepresentations that Cranney made to both Rory and Mary Jo Ewing. Mail fraud does "not require that the victims be pure of heart or even that they have been effectively deceived by the charged misrepresentations. Materiality issues aside, all that matters is that the representations were deliberately made by the defendant." United States v. Camuti, 78 F.3d 738, 742 (1st Cir. 1996). There is no doubt that Cranney made false representations to Rory and Mary Jo Ewing regarding whether Cranney Capital I LLC was a qualified retirement plan. Finally, Rory Ewing's testimony was that he was largely responsible for the management of his mother's funds, and that he was induced to transfer those funds to Cranney Capital I, LLC

Employee Stock Ownership Trust based on Cranney's false representations regarding whether the account with Cranney Capital I would be a qualified retirement plan, whether required distributions would be paid each year, and whether the funds transferred to Cranney would be invested. This was sufficient to convict on Count Fifteen. See United States v. Christopher, 142 F.3d 46, 54 (1st Cir. 1998) ("Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived.").

      e. *Richard Pochepan (Count Nineteen)*

Finally, Cranney argues that there was insufficient evidence to find that Richard Pochepan was defrauded. As discussed above, the question is not whether Pochepan was actually defrauded, but whether Cranney engaged in a scheme to defraud Pochepan.

Pochepan testified as follows. Pochepan and his wife also had a distributorship with Shaklee, and met Cranney at his home in Belmont sometime around 2008. At the time, Pochepan maintained his retirement funds in a Fidelity individual retirement account. While in Cranney's home, Pochepan went to Cranney's office, where Pochepan saw multiple screens with what he believed to be stock market indicators. Cranney told Pochepan that he used these screens to track the market. Cranney said that he was investing for some people, that this was a secret, and that Cranney would allow Pochepan to invest if he wanted to do so. Pochepan went to get his wife, who was downstairs at the time. When both Pochepans returned to Cranney's office, Cranney said that he knew someone who would do the investing for them and could do better than what they were currently earning in their retirement accounts. Cranney said he was investing, and Pochepan took it for granted that he meant investing in the stock market. After this discussion, Pochepan decided to invest eighty-five percent of his retirement savings with Cranney.

17

Pochepan testified that he was concerned about the tax consequences of transferring his retirement funds, but Cranney informed him that this would be a "rollover," and thus would not cause negative tax consequences. Pochepan understood based on what Cranney told him that his account with Cranney Capital I would be similar to Pochepan's then-existing Fidelity individual retirement account. Cranney sent a "Qualified Plan Transfer Request Letter" to Pochepan. See Ex. 436. This letter, which was to be addressed to the then-custodian of Pochepan's individual retirement account, stated, "I have established a qualified retirement plan account with Cranney Capital I, LLC, Employee Stock Ownership Trust." Id. It then directed the custodian to transfer Pochepan's funds to Cranney Capital I. Cranney signed his name as "Trustee/Custodian" under a line labeled "Successor Trustee/Custodian's Acceptance," which stated, "Cranney Capital I, LLC Employee Stock Ownership Trust hereby accepts from your custodianship the above requested transfer of assets for the qualified plan account established for the above named participant." Id. Pochepan used the form to transfer his retirement funds to Cranney.

After the transfer of funds, Pochepan received a document from Cranney referring to Cranney Capital I as a borrower and Pochepan as a lender. Prior to receiving this document, according to Pochepan, Cranney had never indicated that the transaction would be a loan, and had never asked to borrow money. Cranney also completed a 2008 "IRA Contribution Information" Internal Revenue Service Form 5489, and provided a copy to Pochepan, which stated that Pochepan had made $149,985.00 in rollover contributions, and the fair market value of Pochepan's account with Cranney Capital I was $152,207.04. Ex. 435. Pochepan testified that at the time he received this form, he was impressed with the return made on his account over the short period of time in which it had then been invested with Cranney Capital I.

The government's summary chart for Pochepan shows that on October 2, 2008, the Cranney Capital I, LLC Employee Stock Option Trust had a balance of $15,930.99. Id. On October 3, 2008, Pochepan wire transferred $149,985.00 to Cranney Capital I, LLC Employee Stock Option Trust. See Ex. 290.16. In November 2008, Cranney made two transfers totaling $160,000 into the Cranney Capital I, LLC bank account, and transferred $110,000 from that account into Cranney Industries, Inc. Id. The day prior to that transfer, the Cranney Industries, Inc., account had a balance of $935.99. Also in November 2008, Cranney transferred $100,000 from the Cranney Industries, Inc., account into his personal bank account. Id.

On November 21, 2011, Pochepan emailed Cranney stating, "I need to know the value of my acct with you so that the distribution can be figured out." See Ex. 442. Pochepan emailed again on December 14, 2011. See Ex. 445. In response to Pochepan's requests for information, Cranney sent a December 19, 2011, balance statement to Pochepan, which served as the mailing underlying the mail fraud charged in Count Nineteen. See Ex. 446. This document stated that "[a]n open balance of 167,955.46 still remains." Id.

Cranney bases his argument for acquittal on this count on Pochepan's admission that Cranney did not specifically state that he would invest the funds in the stock market. However, the evidence at trial permitted the jury to conclude beyond a reasonable doubt that Cranney made material misrepresentations to Pochepan that Cranney Capital I LLC would function as a qualified retirement plan much like Pochepan's Fidelity qualified retirement plan. Yet, as the government's evidence showed, Cranney Capital I, LLC, was not a qualified retirement plan, but rather a mechanism for Cranney to take money to use to pay his and his wife's own personal expenses. This was sufficient to support a conviction on Count Nineteen.

III.     Conclusion

For the foregoing reasons, Cranney's Motion for Judgment of Acquittal [#482], as

amended, is DENIED.

IT IS SO ORDERED.

Date:   August 9, 2018                                                    /s/ Indira Talwani
                                                                         United States District Judge