UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 14-cr-10276-IT |
| | * | |
| JOHN CRANNEY, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

January 4, 2021

TALWANI, D.J.

I.      Introduction

Petitioner John Cranney's Petition for a Writ of Habeas Corpus [#562] pursuant to 28

U.S.C. § 2255 challenges his convictions as invalid on the ground that he received Constitutionally

ineffective assistance of counsel at trial.  For the following reasons, the petition is DENIED.

II.      Background

On September 25, 2014, Petitioner was indicted on four counts of wire fraud in violation

of 18 U.S.C. § 1343, sixteen counts of mail fraud in violation of 18 U.S.C. § 1341, and three

counts of money laundering in violation of 18 U.S.C. § 1957. Indictment [#1]. Cranney was

represented initially by attorneys from the Massachusetts Federal Public Defender Office, see

Elec. Clerk's Notes [#12]; Notice of Attorney Appearance [#30]. On October 7, 2015, Cranney

filed *pro se* a Motion that his Indictment be Dismissed as Insufficient and a Contingent Request

that his Public Defender be Ordered to Withdraw 1-2 [#39]. On November 13, 2015, the court

appointed CJA Attorney James Budreau as replacement counsel. Elec. Clerk's Notes [#54].

Budreau represented Cranney through trial and at sentencing.

Through his new attorney, Cranney filed a <u>Motion to Dismiss</u> [#65] the <u>Indictment</u> [#1], which the court denied, Mem. & Order [#79].[1] Cranney's counsel also vigorously litigated what evidence was permitted at trial. <u>See</u> Response to Gov't Motion for an Order finding Waiver of Attorney Privilege [#122]; Motion in Limine to Preclude Reference to Ponzi Scheme [#153]; Motion in Limine to Preclude Admission of Unreliable Hearsay Evidence [#154]; Motion in Limine to Present Relevant State of Mind Evidence [#155]; Motion in Limine to Preclude the Gov. from Alleging that his ESOPS/ESOTS Did Not Comply with Federal Regulations [#159]; Response to Gov't Motion to Exclude Use of Civil Judgment as to Gov't Witness [#175]; Response to Gov't Motion to Exclude Self-Serving Hearsay [#176]; Response to Gov't Motion to Exclude Non-Victim Witness Testimony [#178]; Response to Gov't Motion to Exclude Evidence of the Health of Defendant's Wife [#186]; Motion to Suppress Illegal Recording [#187]; Motion in Limine to Exclude Alleged Bad Act Evidence [#195]; Motion for Clarification [#210]; Motion for Reconsideration [#292]; Motion to Exclude Hearsay from Deposition [#385]; Motion in Limine to Exclude Letter, Texts and Emails Based Upon Hearsay [#410]; Defendant's Motion for Clarification [#436]; Supplemental Motion to Exclude Letters and Emails [#450].

Granting in part and denying in part the government's motion in limine, the court allowed Petitioner to offer promissory notes executed by Petitioner and a testifying witness, but precluded such witnesses from testifying as to their own understanding of Petitioner's business or practices, and precluded Petitioner from offering the witnesses' testimony as to what Petitioner stated to them. Elec. Order [#202]; Order on Motion for Reconsideration [#296]. Petitioner sought to challenge these last two Orders through a *pro se* interlocutory appeal. Notice

---

[1] Counsel sought reconsideration, <u>see</u> Motion to Reconsider [#80], which the court denied as well. Elec. Order [#83].

of Appeal [#326]. The Court of Appeals dismissed the interlocutory appeal, finding that the court lacked jurisdiction to consider the appeal prior to sentencing. Judgment of USCA [#374].

Following a two-week jury trial in April and May of 2018, Petitioner was found guilty on three counts of wire fraud in violation of 18 U.S.C. § 1343, twelve counts of mail fraud in violation of 18 U.S.C. § 1341, and three counts of money laundering in violation of 18 U.S.C. § 1957, and not guilty on one additional count of wire fraud.[2] Elec. Clerk's Notes [#492]; Judgment [#528]. At the close of the government's evidence, defense counsel filed a Motion for Judgment of Acquittal [#482][3] pursuant to Federal Rule of Criminal Procedure 29(a) arguing that the evidence of the mail fraud alleged in Counts Eleven, Twelve, Fourteen, Fifteen, Eighteen, and Nineteen, and of the money laundering alleged in Count Twenty-One of the Indictment [#1] was insufficient to warrant conviction. The court reserved decision and the defense rested without presenting evidence of its own. Transcript of Trial Day Eleven 15 [#554]; see also Mem. & Ord. 1-2 [#525]. After the jury returned a verdict of guilty on all but one count, Transcript of Trial Day Twelve 9-12 [#555], the court denied the Motion for Judgment of Acquittal [#482], Elec. Ord. [#512], finding the evidence sufficient to support the jury's verdict. See Mem. and Ord. [#525]. The trial evidence included the following:

a.     Cranney's Entities

Viewed in the light most favorable to the verdict, the evidence demonstrated that Cranney created entities to receive funds that he solicited from others. One such entity was Cranney Capital I LLC, which Cranney characterized as a qualified retirement plan into which individuals could rollover funds from already existing individual retirement accounts and 401(k) retirement accounts

---

[2] Prior to trial, Counts 5, 6, 7, and 20 were dismissed on the motion of the United States. See Dismissal of Counts 5 and 7 [#230]; Dismissal of Count 6 [#473]; Dismissal of Count 20 [#474]; see also Judgment [#528].

[3] The original Motion for Judgment of Acquittal [#482] inadvertently omitted Count 18. The court allowed counsel to amend the motion. See Assented to Motion to Amend Motion for Acquittal [#485]; Electronic Order [#501].

without incurring tax penalties. Cranney called Cranney Capital I LLC an Employee Stock Ownership Trust, but Cranney did not limit participation in the entity to Cranney Capital I LLC employees. In a letter to his attorney who helped him establish the Cranney Capital I LLC entity, Cranney stated that he wanted to use this name, with a roman numeral, because "[t]his is what some of the major hedge funds do and it will make it more flexible for stationary and general reference." Trial Exhibit ("Ex.") 141. Cranney also wrote that this naming would allow him to easily add more entities later. Cranney later formed a separate entity named Cranney Capital III to receive monies from sources other than retirement accounts. Cranney described Cranney Capital III in filings with the Commonwealth of Massachusetts as being in the business of "investment management." Ex. 171.

b.      Promissory Notes

Cranney sent Elizabeth Sutton, Mary Jo Ewing, and Richard Pochepan "Promissory Notes" after they transferred money to one of his entities. These "Promissory Notes" stated that the funds transferred to Cranney Capital I or Cranney Capital III were a loan from the individual (or in some cases, the couple), that the transferor's right to withdraw funds was limited for a specified period of time, and that a guaranteed interest rate would be paid on the money transferred. . . . .

c.      Elizabeth Sutton (Counts Eleven, Twelve, Fourteen, Eighteen, and Twenty-One)

. . . .Elizabeth Sutton died prior to trial. The government's evidence that Cranney engaged in a scheme to defraud Elizabeth Sutton was based on numerous documents as well as on the testimony of her husband, Jerry Sutton, and that of Paul LaGris, a friend of both Cranney's and Elizabeth Sutton's.

Jerry Sutton testified as follows. He was introduced to Cranney through Elizabeth Sutton. Elizabeth Sutton was a distributor for the Shaklee Corporation, which manufactures and distributes nutritional products through independent distributors. Cranney was a prominent distributor for Shaklee, and Shaklee promoted Cranney as one of its most successful distributors.

Trial evidence shows the Suttons were transferring money to Cranney Capital III by March 2006. A March 8, 2006, letter from Cranney to the Suttons acknowledges receipt "by Cranney Capital III" of a $10,000.00 check and states interest "will be paid on the loan at the rate of prime plus two percent simple interest." Ex. 475. A January 10, 2007, check from the Suttons' joint account was written to Cranney Capital III in the amount of $10,000.00. Ex. 477. A June 8, 2007, letter from Cranney to Jerry Sutton attached four separate promissory notes between Jerry Sutton as "lender" and Cranney Capital III as "borrower." Ex. 484.

Sometime prior to 2008, Jerry and Elizabeth Sutton stayed at Cranney's home. In the course of their stay, Cranney hosted a meeting with the Suttons, Paul LaGris, and LaGris' wife. Cranney held the meeting in his home office, where multiple computer monitors were on display. Cranney told those in attendance

that he used these screens to track the stock market. Jerry Sutton testified that Cranney explained "how he was investing the money that he – that Liz had given – or loaned him, how he was making money, and he could pay better interest rates than we were getting from the company that we had at home." Further, Cranney explained that "he could tell where to invest the money, and that was kind of the way it was. He could make – make more than we were getting and that's why he could give us prime rate." Elizabeth Sutton was in the room when Cranney made these statements. At the time, Jerry Sutton understood Cranney to be using Cranney Capital III "to develop the money – he could invest that money that we were loaning him to invest in this program that he had set up." . . .

Jerry Sutton further testified that he overheard Paul LaGris ask Cranney how he would pay interest rates on the money that was transferred to his entities. Cranney told LaGris he would "use the stock market to make money for the investment." Jerry Sutton later asked LaGris whether he was going to invest in Cranney Capital III, and LaGris responded in the affirmative. Elizabeth Sutton was present for this conversation between her husband and LaGris. According to LaGris, Elizabeth Sutton asked LaGris whether he was investing with Cranney while they were standing in Cranney's kitchen one morning, and LaGris said that yes, he was investing with Cranney. Elizabeth Sutton later transferred money from the Elizabeth C. Weekley Trust (which . . . used Elizabeth Sutton's name from her prior marriage, "Weekley") to Cranney Capital III, and Cranney paid LaGris commissions based on the amounts of money he received from Elizabeth Sutton.

A February 2, 2009, letter from Cranney to Jerry Sutton stated that "Liz requested a current statement as to the monies you have with Cranney Capital III." Attached to this letter were documents providing cash flow data and an amortization schedule for amounts labeled as loans from Elizabeth Weekley's trust to Cranney Capital III. Ex. 487.

The mail fraud counts pertaining to Elizabeth Sutton involve the following mailings that occurred between March 2010 and September 2011. A March 5, 2010, check from "Elizabeth C. Weekley Trust" to "Cranney Cap III" for $100,000, see Ex. 488, is the subject of the mail fraud charged in Count Eleven. March 23 and 24, 2010, checks from "Elizabeth C. Weekley Trust" to "Cranney Cap III" for $30,000 and $100,000, see Ex. 489, are the subjects of Count Twelve. December 15, 2010, checks from "Elizabeth C. Weekley Trust" to "Cranney Cap III" for $20,000 and $50,000, see Ex. 490, are the subjects of Count Fourteen. A September 12, 2011, check from "Elizabeth Weekley Sutton" to "Cranney Corp. III" for $15,000, and two September 19, 2011, checks from "Elizabeth C. Weekley Trust" to "Cranney Corp. III" for $50,000 and $35,000, see Ex. 491, are the subjects of Count Eighteen.

A[t] trial, the government introduced cash flow charts showing the funds available in various Cranney accounts on certain dates following the deposits of checks into the Cranney Capital III, Inc., account. Those charts, which are based on account statements, show that prior to cash infusions derived from deposits of participants' checks, Cranney's accounts had low balances. When deposits were

made into the Cranney Capital III, Inc., account, funds were quickly transferred first to "Cranney Industries, Inc.," accounts, and then to Cranney's personal bank accounts, as well as those belonging to Cranney's son. See, e.g., Ex. 290.10, 290.15.

This evidence shows, for example, that on March 7, 2010, the Cranney Capital III account had a balance of $821.68. On March 8, 2010, the balance of the first Cranney Industries, Inc., account was $46.88. That same day, the balance of the second Cranney Industries, Inc., account was -$96.41. After Elizabeth Sutton's $100,000 check was deposited into the Cranney Capital III, Inc., bank account on March 8, 2010, Cranney transferred most of this money to one Cranney Industries, Inc., account, then quickly moved most of the money into the other Cranney Industries, Inc., account. On March 10, 2010, Cranney transferred $10,000 from his second Cranney Industries, Inc., account to his personal account, and on that same day transferred $50,342.00 to his son's personal bank account. See Ex. 290.10. The evidence further shows that after $130,000 from Elizabeth Sutton was deposited into Cranney Capital III, Inc., on March 25, 2010, Cranney made two transfers totaling $103,000 into one Cranney Industries, Inc., account, and then moved most of this to his second Cranney Industries, Inc., account. Between March 26, 2010, and March 30, 2010, Cranney transferred $18,500 from his second Cranney Industries, Inc., account into his personal account and $68,024.35 from that Cranney Industries, Inc., account into his son's personal account. See Ex. 290.10.

As further evidence of the scheme to defraud Elizabeth Sutton, the government introduced evidence that Cranney was paying Paul LaGris commissions for each Sutton "investment" in Cranney Capital III. Paul LaGris testified that Cranney reimbursed LaGris and his wife for expenses they incurred while working for Cranney's Shaklee distributorships, such as traveling to annual Shaklee conferences. Cranney also paid LaGris "commissions" for work unrelated to Shaklee. This work involved communicating with Elizabeth Sutton, whom Cranney described to LaGris as a woman who wanted to invest with Cranney. LaGris' assignment was to call Elizabeth Sutton on a regular basis to maintain a positive relationship so that she would continue communicating with Cranney. A March 10, 2012, letter from LaGris to Cranney, in which LaGris requested repayment of his accounts with Cranney, stated the following:

> Our Commissions & Bonus (A) account where beginning April 20, 2006 you asked us to assist you in communicating with Shaklee people who were also investing in your fund: ES; VD; GS. The accounting here is based on a 7% Commission & Bonus you offered us for each new investment, i.e. $50K we earned $3,500 which you paid us out of the new investments.

See Ex. 346. LaGris stated that he used the word "commission" because this was the characterization Cranney used. Attached to the letter was an accounting of commissions LaGris earned from Cranney, primarily from Elizabeth Sutton's money transfers to Cranney Capital III between April 20, 2006, and July 29,

2011. LaGris testified that he created the document, but acknowledged that he did so long after many of the commissions were earned.

The government introduced checks sent from Cranney Capital III, Inc., to LaGris. One written to "LaGris Associates" for $7,000.00, dated October 15, 2006, states that it is for "Sutton – 100K @ 7%." Another check for $2800.00 on the same date states "Sutton – 40K @ 7%." A $2100.00 check dated January 19, 2007, written to Paul LaGris, is for "7% of 30,000 Sutton." Some checks from Cranney to LaGris state vaguely that they are for a "commission." Similar checks referring to Sutton commissions were paid to LaGris' wife.

. . . The government acknowledges that both Suttons received promissory notes after they transferred money to Cranney Capital III. Further, Jerry Sutton testified that he classified his transfers to Cranney as "loans" in the course of bankruptcy proceedings. Jerry Sutton also referred at times in the course of his testimony to his "lending" money to Cranney, and to Cranney paying "interest rates" on the funds transferred to Cranney Capital III. But Jerry Sutton also consistently testified that Cranney represented that the money that was transferred to Cranney Capital III was being invested in the stock market, which would enable Cranney to provide the returns that he was promising to those who transferred money.

Despite the promissory notes received after each transfer and Jerry Sutton's references to loans and interest rates, a rational jury could find based on the evidence presented at trial that the government had proven beyond a reasonable doubt that Elizabeth Sutton transferred money to Cranney Capital III – whether characterized as a loan or investment – after Cranney falsely represented to her that he would invest the money in the stock market to provide better returns than she would receive by investing the money elsewhere. Further, the testimony regarding Cranney's statements to Elizabeth Sutton during the meeting in Cranney's home office, in which he told both the Suttons and LaGrises that the money Elizabeth Sutton had transferred to him previously was invested in the stock market and purported to show how that money was performing in the stock market, allowed the jury to conclude that Cranney made material misrepresentations that induced Elizabeth Sutton to transfer more money to Cranney Capital III.

Cranney conveyed to Elizabeth Sutton that if she transferred her money to Cranney Capital III, she could obtain a higher return than was available elsewhere. This was false, and Cranney knew it. Funds transferred to Cranney Capital III were never going to provide the returns Cranney promised. The evidence at trial showed that Cranney did not invest money that Sutton transferred to Cranney Capital III in the stock market. Instead, he quickly transferred that money from the Cranney Capital III account, through multiple Cranney Industries accounts, and ultimately into Cranney's personal bank accounts or those of his family members. Once in these accounts, the evidence showed, the funds were used to pay personal expenses, including credit card bills and mortgage payments. Thus, Cranney misrepresented what he would do with the transferred funds, and it

was reasonable for the jury to conclude that this misrepresentation had a tendency to influence Elizabeth Sutton to transfer money to Cranney Capital III.

Most importantly, Cranney used the official-sounding entity, Cranney Capital III, to convince Elizabeth Sutton that her funds would be invested. The use of the Cranney Capital III name, which appeared on all relevant correspondence between both Cranney and the Suttons, provided the appearance that Sutton's money would be part of a legitimate fund. Cranney also falsely represented that he would be acting as "trustee" of that fund. In reality, the government's evidence showed that Cranney was using the Cranney Capital III entity as a mechanism to take Sutton's funds. Those funds were then quickly transferred to other Cranney accounts, and ultimately used to pay Cranney's personal expenses. Further, Cranney did not create any mechanism to account for money transferred from Cranney Capital III into Cranney's accounts. Cranney Capital III did not loan money to Cranney, or "invest" in Cranney's businesses. Instead, Cranney simply helped himself to the money Sutton invested in Cranney Capital III.

. . . .

d.     Mary Jo Ewing (Count Fifteen)

. . . Like Elizabeth Sutton, Mary Jo Ewing died prior to trial. Mary Jo Ewing's son, Rory Ewing, testified at trial that he and his mother were distributors for Shaklee in California and that he has known Cranney for more than twenty years through his mother's involvement with Shaklee. Rory Ewing assisted his mother with managing her retirement funds. During a national Shaklee conference, Cranney suggested to Rory and Mary Jo Ewing that they invest with him and stated that others who had invested with him were enjoying great returns.

Rory Ewing communicated with Cranney about the possibility that his mother would invest her retirement accounts in one of Cranney's entities. He informed Cranney that the funds his mother was investing with Cranney needed to be kept safe, because Mary Jo Ewing had Parkinson's disease and depended upon distributions from her retirement accounts to pay for her treatments. Rory Ewing further stated that he wanted to ensure that the plan established with Cranney would be a qualified retirement plan, because Mary Jo Ewing was transferring funds already in a qualified retirement plan and did not want to incur negative tax consequences from her transfer.

Eventually, Cranney came to the Ewings' office and provided a document titled "Qualified Plan Transfer Request Letter," which listed Cranney as the "Trustee/Custodian" of the Qualified Retirement Plan/Individual Retirement Account that was to be established with Cranney Capital I LLC Employee Stock Ownership Trust. Cranney signed his name under the following statement: "Cranney Capital I, LLC Employee Stock Ownership Trust hereby accepts from your custodianship the above requested transfer of assets for the qualified plan account established for the above named participant." Ex. 598. Rory Ewing testified that Cranney stated that the plan that was to be established with Cranney

Capital I would be a qualified retirement plan. Cranney told Rory Ewing that the funds would be safe with him, and there would be no need to worry, as other people had invested with Cranney for a long time and had not experienced any problems. After these assurances, Rory Ewing facilitated the transfer of his mother's funds to Cranney Capital I LLC.

The government introduced a summary chart showing a deposit of $701,463.63 from Mary Jo Ewing, a deposit of $49,255.67 from Mary Jo Ewing, and a deposit of $33,744.60 from Rory Ewing into a Cranney Capital I, LLC Employee Stock Option Trust account on January 2, 2009. See Ex. 290.12. The balance in the Cranney Capital I, LLC Employee Stock Option Trust account the prior day was $890.99. Id. After the January 2 deposits, Cranney made four transfers to a Cranney Capital I, LLC account. Id. From this account, Cranney made multiple transfers to his Cranney Industries, Inc., accounts. Ultimately, Cranney transferred from these Cranney Industries, Inc., accounts $20,000 to his personal bank account on January 5, 2009; $10,000 to his personal account on January 6; $200,000 to his personal account on January 14; and $350,000 to his personal account on April 15. Id. In the period immediately following the January 2 deposits from Mary Jo Ewing, Cranney also issued several checks to repay others who had transferred funds to Cranney Capital I LLC, Employee Stock Option Trust.

After Mary Jo Ewing's funds were transferred to Cranney Capital I LLC Employee Stock Ownership Trust, Cranney provided the first year's minimum required distribution in the form of a December 17, 2010, $33,463.00 check, on which Count 15 is based. See Ex. 201.11, Ex. 311.  This check was written from "Cranney Capital I LLC Employee Stock Ownership Trust," with "J.W. Cranney" appearing on the "authorized signature" line. Id. After this first distribution, however, Cranney failed to provide the minimum required distributions, despite numerous communications from Rory Ewing requesting payment of those distributions.

As with the Suttons, the Ewings received promissory notes after they transferred funds. These promissory notes appeared on Cranney Capital I LLC letterhead. Rory Ewing testified that prior to Cranney sending a promissory note from Cranney Capital I LLC, Cranney had not asked for a loan or referred to the transfer of funds as a loan. Cranney never informed Rory Ewing prior to the transfer of money to Cranney Capital I LLC that this would be a loan. Rory Ewing believed Cranney would be investing Mary Jo Ewing's money in the stock market. According to Rory Ewing, he would not have invested his mother's retirement funds with Cranney Capital I LLC had he been told it was a loan. Also like the Suttons, Rory Ewing filed an affidavit with the bankruptcy court asserting that the transferred funds were loans. He explained this affidavit as based on the advice of a bankruptcy attorney.

. . . .

e.      Richard Pochepan (Count Nineteen)

. . . Pochepan testified as follows. Pochepan and his wife also had a distributorship with Shaklee, and met Cranney at his home in Belmont sometime around 2008. At the time, Pochepan maintained his retirement funds in a Fidelity individual retirement account. While in Cranney's home, Pochepan went to Cranney's office, where Pochepan saw multiple screens with what he believed to be stock market indicators. Cranney told Pochepan that he used these screens to track the market. Cranney said that he was investing for some people, that this was a secret, and that Cranney would allow Pochepan to invest if he wanted to do so. Pochepan went to get his wife, who was downstairs at the time. When both Pochepans returned to Cranney's office, Cranney said that he knew someone who would do the investing for them and could do better than what they were currently earning in their retirement accounts. Cranney said he was investing, and Pochepan took it for granted that he meant investing in the stock market. After this discussion, Pochepan decided to invest eighty-five percent of his retirement savings with Cranney.

Pochepan testified that he was concerned about the tax consequences of transferring his retirement funds, but Cranney informed him that this would be a "rollover," and thus would not cause negative tax consequences. Pochepan understood based on what Cranney told him that his account with Cranney Capital I would be similar to Pochepan's then-existing Fidelity individual retirement account. Cranney sent a "Qualified Plan Transfer Request Letter" to Pochepan. See Ex. 436. This letter, which was to be addressed to the then-custodian of Pochepan's individual retirement account, stated, "I have established a qualified retirement plan account with Cranney Capital I, LLC, Employee Stock Ownership Trust." Id. It then directed the custodian to transfer Pochepan's funds to Cranney Capital I. Cranney signed his name as "Trustee/Custodian" under a line labeled "Successor Trustee/Custodian's Acceptance," which stated, "Cranney Capital I, LLC Employee Stock Ownership Trust hereby accepts from your custodianship the above requested transfer of assets for the qualified plan account established for the above named participant." Id. Pochepan used the form to transfer his retirement funds to Cranney.

After the transfer of funds, Pochepan received a document from Cranney referring to Cranney Capital I as a borrower and Pochepan as a lender. Prior to receiving this document, according to Pochepan, Cranney had never indicated that the transaction would be a loan, and had never asked to borrow money. Cranney also completed a 2008 "IRA Contribution Information" Internal Revenue Service Form 5489, and provided a copy to Pochepan, which stated that Pochepan had made $149,985.00 in rollover contributions, and the fair market value of Pochepan's account with Cranney Capital I was $152,207.04. Ex. 435. Pochepan testified that at the time he received this form, he was impressed with the return made on his account over the short period of time in which it had then been invested with Cranney Capital I.

The government's summary chart for Pochepan shows that on October 2, 2008, the Cranney Capital I, LLC Employee Stock Option Trust had a balance of

$15,930.99. Id. On October 3, 2008, Pochepan wire transferred $149,985.00 to Cranney Capital I, LLC Employee Stock Option Trust. See Ex. 290.16. In November 2008, Cranney made two transfers totaling $160,000 into the Cranney Capital I, LLC bank account, and transferred $110,000 from that account into Cranney Industries, Inc. Id. The day prior to that transfer, the Cranney Industries, Inc., account had a balance of $935.99. Also in November 2008, Cranney transferred $100,000 from the Cranney Industries, Inc., account into his personal bank account. Id.

On November 21, 2011, Pochepan emailed Cranney stating, "I need to know the value of my acct with you so that the distribution can be figured out." See Ex. 442. Pochepan emailed again on December 14, 2011. See Ex. 445. In response to Pochepan's requests for information, Cranney sent a December 19, 2011, balance statement to Pochepan, which served as the mailing underlying the mail fraud charged in Count Nineteen. See Ex. 446. This document stated that "[a]n open balance of 167,955.46 still remains." Id.

Mem. and Ord. 3-19 [#525] (footnotes omitted).

On August 9, 2018, the court sentenced Cranney to sixty months in prison on each count, to be served concurrently, three years of supervised release on each count, to be served concurrently, and ordered restitution of $5,587,432.10 in addition to the $1,800 special assessment. See Elec. Clerk's Notes [#526]; Judgment [#528].

Cranney, through trial counsel, filed a Notice of Appeal [#520] the following day. New counsel was appointed for the appeal, but on August 16, 2019, the appeal was dismissed on Cranney's motion.[4] Judgment of USCA [#565].

III.    Legal Standard

A federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States,…or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside

---

[4] Cranney contends that the court-appointed appeals counsel "declined to draft and file a direct appeal" but rather "threatened that unless [Cranney] withdrew his appeals notice, he would file a so-called 'Anders Petition'" seeking to withdraw. Pet.'s Reply 2 [#598]. Cranney has filed a draft of that petition. Draft Mem. in Supp. of Motion to Withdraw under Anders v. California [#598-2]. The unsigned draft states that counsel "does not believe that the appeal presents a non-frivolous issue" and proceeds to set forth his reasoning. Id.

or correct the sentence." 28 U.S.C. § 2255. The Sixth Amendment to the Constitution protects the right of the accused to representation by an attorney "who plays the role necessary to ensure that the trial is fair." Strickland v. Washington, 466 U.S. 668, 685 (1984).

Where a convicted defendant identifies "the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," a court must determine whether "in light of all the circumstances," counsel acted "outside the wide range of professionally competent assistance." Id. at 690. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," id., and "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal quotations and citations omitted).

However, where "counsel's representation fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," counsel was constitutionally ineffective. See id. at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id at 694.

 "[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. U.S., 538 U.S. 500, 504 (2003).

IV.    Analysis

   a.   The Habeas Petition is Not Signed Under Penalty of Perjury

Respondent objects that Petitioner failed to sign his Petition [#562] under penalty of perjury and moreover, that the signature on the Petition does not appear to be Petitioner's.

Resp.'s Opp'n 2 n.2 [#567]. Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings for the United States District Courts requires that a § 2255 motion "be signed under penalty of perjury." After Respondent raised this objection, Petitioner resubmitted the last page of the Petition. See Signature Page [#598-3]. The original last page of the Petition [#562] and the later filed Signature Page [#598-3] are virtually identical -- both are dated August 7, 2019, and both have a signature following the words "respectfully submitted" – although the two signatures differ. Neither states, however, that the document is signed under penalty of perjury.[5]

The government argues that the failure to sign the Petition under penalty of perjury is a sufficient basis for denying the relief requested. Resp.'s Opp'n 2 n.2 [#567]. The court agrees that the Petition should be properly signed under penalty of perjury before relief may be granted. Nonetheless, the court considers the Petition to determine whether it is otherwise meritorious or whether it lacks merit such that affording Petitioner a further opportunity to add the appropriate verification would be futile.

b. Alleged Ineffective Assistance of Counsel in Connection with the Motion to Dismiss the Indictment

Petitioner claims that his attorney provided ineffective assistance of counsel in connection with the motion to dismiss the indictment. Pet. 9 [#562]. Respondent contends first that this claim is procedurally defaulted because Petitioner did not appeal the court's denial of his Motion to Dismiss [#65] the Indictment [#1]. Resp.'s Opp'n 8 [#567]. A direct challenge to the court's denial of the Motion to Dismiss [#65] would be procedurally defaulted. However, the

---

[5] Between the filing of the first and second signature pages, another signature page was mailed to the court by Mr. Rodney Young, who has sought on various occasions to file pleadings in this matter on Petitioner's behalf. See Order [#424]. The court declined to accept Mr. Young's filing where it was not submitted with leave of court or by a party to the action. See Elec. Notice [#577]. The signature page included in Mr. Young's mailing appears to be the signature page submitted with the original petition, with the words "Signed under the pains and penalties of perjury" typed in before the signature.

court understands Petitioner's claim not as a direct challenge to the court's denial of his motion,

but as an ineffective assistance of counsel claim relating to the manner in which that motion was

drafted. The claim, thus, is not procedurally defaulted. See Massaro, 538 U.S. at 504.

Even so, on the merits, Petitioner's argument has no traction. Counsel not only fully

briefed the motion, but also filed a motion for reconsideration after his initial motion was

denied.[6] Petitioner complains that counsel "failed to cite and argue relevant precedent mandating

specificity in each count of the Indictment" because he purportedly failed to mention two cases:

United States v. Nance, 533 F.2d 699 (D.C. Cir. 1976), and United States v. Huff, 512 F.2d 66

(5th Cir. 1975). Pet. 8-9 [#562]. But this charge is simply not true where counsel cited to Nance

four times in his Motion to Dismiss 3-5, 12 [#65], and to Huff in his Motion for Reconsideration

1-2 [#80] of the denial.[7] In any event, both of these out-of-circuit cases are distinguishable from

the Indictment at issue here, where the Indictment detailed the specific acts in furtherance of the

unlawful scheme in great detail.[8]

---

[6] The court notes that Cranney, by his own account, was forewarned by prior counsel that the motion to dismiss would not be successful. Cranney recounts that prior counsel advised him "of the unlikelihood of winning pre-trial dismissal of the indictment – howsoever well argued and seemingly justified," and advised the court that prior counsel "has steadfastly refused to draft or file such a motion." Motion that his Indictment be Dismissed as Insufficient and a Contingent Request that his Public Defender be Ordered to Withdraw 1-2 [#39].

[7] Counsel also explained in great detail in a memorandum to Cranney why "the citation to Nance is not helpful." Mem. Re. Review of Mtn. to Dismiss (Exhibit O) 84 [#562-1].

[8] The Indictment charged that Cranney defrauded at least 15 individuals of more than $ 6 million, starting in or about 2001 and continuing until in or about 2012, Indictment ¶¶ 2, 5 [#1], through a fraud scheme that he personally "devised and executed" in which he:

> induced individuals to send him funds by mail and wire representing, falsely, that he would invest those funds and pay the individuals a guaranteed rate of return. In fact, as [Cranney] well knew, he did not intend to invest the funds he received, but instead to use them for his own personal and business purposes and to make payments to others who had invested money with him.

Id. ¶ 3. The Indictment alleged that Cranney did the following in furtherance of his fraudulent scheme:

- Solicited people with whom he had personal and business relationships to give him money to invest on their behalf;

- Held himself out as a financially successful businessman when, in fact, as Cranney knew, his personal and business expenses regularly exceeded his legitimate income;

- Represented to some prospective investors that he had made a lot of money investing in the stock market (both for himself and others), which was false;

- Promised a guaranteed rate of return, usually in the amount of 2% above prime rate, but for some people, a fixed rate of return in amounts as high as 10%;

- Represented that the funds he received would be invested to earn money to pay the promised returns, even though he did not intend to invest the money and instead planned to use it for his own personal and business purposes, and to repay other investors;

- Represented to some investors that their money was pooled in funds holding millions of dollars when, in fact, as Cranney knew, Cranney did not pool the money in large funds because Cranney promptly disbursed most of the money he received for his own purposes and used that money to make payments to other investors and creditors;

- Represented to some investors that they could withdraw their money at any time or with just short notice to Cranney, and when some investors attempted to get their money back, offered excuses about why their money was unavailable and could not be withdrawn at that time, even though Cranney knew that those excuses were false and that he could not return investors funds because he had since spent them;

- Sent investors unsecured promissory notes signed by Cranney setting forth the guaranteed rates he had promised, then when investors questioned Cranney about why he had sent them promissory notes, he falsely explained he sent them the notes for tax reasons or otherwise for the benefit of the investor;

- Established official-sounding investment entities, named Cranney Capital I LLC and Cranney Capital III, Inc., directed investors to send their money to those entities, and used the entity names in documents sent to investors, leading investors to believe that their funds were being invested through those entities, when Cranney caused all the funds deposited to the entities' accounts to be transferred promptly to Defendant's other personal and business accounts;

- Established the Cranney Capital I LLC Employee Stock Ownership Trust, which he represented to prospective investors was a "qualified" plan in which they could "rollover" money from their IRA and 401(k) retirement accounts without paying withdrawal taxes and penalties, when, as Cranney knew, none of the investors was an employee of Defendant or Cranney Capital I LLC; and

- Caused "reports" to be sent to some investors that purported to represent the amounts that investors had earned and the total balance in their investment accounts, when, in fact, as Cranney knew, those stated returns were fictitious, and the stated balances did not exist because Cranney had long since spent the money for investment or his own personal or business uses or for making payments to other investors and creditors.

15

Petitioner also argues that his earned income would have contradicted the prosecution's contention that he had a need and motive to defraud others, and that counsel failed to raise this issue in his motion to dismiss the Indictment. But, as counsel noted in a memorandum to Cranney, "the government has no obligation to produce any exculpatory evidence in these counts" of the Indictment nor is it required to plead "any defense [Cranney] might have." Mem. Re. Review of Mtn. to Dismiss (Exhibit O) 85 [#562-1]. Indeed, as the court has explained: "At the indictment stage, the government need not show, but merely must allege, the required elements. Indeed, courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind the indictment's allegations." Order 4 [#79] (internal quotations and citation omitted).[9]

In sum, there is no indication whatsoever that counsel's "representation fell below an objective standard of reasonableness" in efforts to advocate that the court dismiss the Indictment. See Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

---

See id. ¶ 4.

[9] Petitioner also contends that counsel "failed to challenge" the money laundering charges, which Cranney characterizes as an accusation that he was "hiding ('laundering') financial transactions." Pet. 7 [#562]. In Cranney's view, since his bank accounts all incorporated his surname in their caption and recorded "John W. Cranney" as owner, the bank accounts could not be used to hide or launder money, and that "[r]eferencing the accounts by title – not just number …would logically have belied the money-laundering charges altogether." The money laundering charges do not criminalize "hiding" financial transactions but "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity..." 18 U.S.C. § 1957(a). Had counsel raised Petitioner's requested challenge it would have been rejected as frivolous.

c.  <u>Alleged Ineffective Assistance of Counsel at Trial</u>

Petitioner argues that counsel "buried exculpatory evidence" at trial in a variety of ways.
Pet. 4 [#562].

1.  <u>Failure to Argue that Cranney's Earned Income was Adequate to Service Debt</u>

Petitioner alleges that counsel "never advanced the critical argument that Mr. Cranney's
earned income, until suspended, had been available – let alone *adequate* – to service his debt."
Pet. 4 [#562]. Respondent correctly notes that Cranney's allegation is "factually incorrect"
because counsel did offer "Cranney's 1099s reflecting payments from Shaklee to Cranney and
his entity Belmont Industries for the years 2001 through 2012" as well as a summary chart
reflecting the income from Shaklee.[10] Resp.'s Opp'n 6 [#567] (citing Admitted Exhibit List
Exhibits 921-944, 946 [#492]).

Petitioner complains further that counsel did not address the "suspension" of Cranney's
Shaklee commissions. Pet. 4 [#562]. Respondent suggests that counsel's omission of "evidence
of the Massachusetts Securities Division's action against Cranney and the resulting shut-off of
income by Shaklee" may have been a strategic choice to avoid opening the door in light of the
court's order granting a defense motion in limine precluding the government from using the term
"Ponzi scheme." Resp.'s Opp'n 7 [#567] (citing Order [#204]). The letter from Shaklee
suspending Cranney's Distributorship and all commissions and bonuses pending further
investigation quotes the Administrative Complaint filed by the Secretary of the Commonwealth

---

[10] Petitioner also faults counsel for "fail[ing] to arrange for expert testimony and graphics to
present such critical data." Pet. 4 [#562]. However, he does not explain how counsel's chosen
strategy "fell below an objective standard of reasonableness" or what testimony an expert could
have offered such that the failure to elicit that testimony "undermine[s] confidence in the
outcome" of the trial. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984).

of Massachusetts as alleging that Cranney "engaged in a Ponzi scheme." Exhibits to Petition

("Exhibit S") 91-92 [#562-1].[11]

Finally, Respondent argues that "the evidence at trial clearly established that Cranney—

contrary to the assertions in his Petition—failed or refused to repay multiple victims long before

Shaklee cut off his income stream, as the Court itself pointed out at sentencing."[12] Resp.'s Opp'n

7 [#567] (citing Sentencing Transcript 70-71, 73 [#556]). Respondent is correct. Moreover, the

fact that Cranney's Shaklee income, if not suspended, would have been sufficient to prolong his

fraudulent scheme does not make that scheme any less fraudulent.

Petitioner also points to counsel's failure to present at trial the chart Petitioner prepared

titled "Earned Income vs. Debt Service on Promissory Notes," which Petitioner argues

demonstrated his ability to repay all his investors. Pet. 5-7 [#562]. Respondent, however, notes

that "evidence at trial established that Cranney had not in fact repaid several people when their

money was due or when they requested repayment," Resp.'s Opp'n 7 [#567] (citing Sentencing

Transcript 70-71 [#556]), and that, moreover, counsel "gave careful consideration to Cranney's

summary charts before deciding not to use them at trial." Resp.'s Opp'n 7-8 [#567] (citing

---

[11] In his Reply 4 [#598], Petitioner accuses his counsel of "acting in the government's interest" by avoiding the term "Ponzi scheme" because it would "exclude precedent" advantageous to his defense. Defense counsel properly sought and obtained the order precluding the use of the term "Ponzi scheme" in part because "the prejudicial impact of testimony and/or references to pyramid/Ponzi scheme outweighs any relevance the court may assign the term." Motion in Limine [#153]. In any event, the label affixed to the evidence here is not relevant in determining the import of the legal precedent.

[12] Petitioner faults counsel for failing to cross-examine witness Sarah Mulas, his former bookkeeper, "regarding paybacks" and "the crucial issue of ROI." Pet. 5 [#562]. He does not explain what information she could have offered that, in light of the other evidence presented at trial, would have been sufficient to "undermine[s] confidence in the outcome" of the case. See Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). As the court noted at sentencing, "the evidence at trial was that, well before the Shaklee money ended, the income that came in was not sufficient to make…regular payments due, including the amounts promised under these notes." Sentencing Transcript 10-11 [#556].

Exhibits to Petition E, I, and J [#562-1]). Indeed, although Petitioner quotes an email in which counsel wrote "I have no problem with charts, but we need to be more concise…," Pet. 7 [#562], to demonstrate that the attorney "acknowledge[ed] the backup data" and did not have any objections to this particular chart's evidentiary value, the email continues with counsel's insistence that he and Cranney also "need to understand the underlying documents that support the data. It must be admissible evidence (cannot have been t-values created in 2013 post events or in preparation for litigation)." August 11, 2017 Email from Budreau (Exhibit J) 76 [#562-1]. Petitioner identifies the spreadsheets and line graphs submitted as Exhibit G to his Petition as the "backup data" counsel sought, Pet. 7 [#562][13], but those documents do not provide supporting "admissible evidence" identifying "underlying documents" from which the charts and graphs derive their data, which is what counsel requested and, indeed, what he was required to obtain in order to use Cranney's graph at trial. See Fed. R. Ev. 1006 ("the proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplication available for examination or copying or both by to other parties at a reasonable time and place. And the court may order the proponent to produce them in court"). Cranney has not demonstrated that he ever provided the documentation counsel properly requested.

In sum, the court finds no indication that counsel's litigation of these issues was in any way inadequate, let alone falling below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

---

[13] In his Reply 4 [#598], Petitioner also asserts that "Budreau had seen proof of [Cranney]'s earned income and all promissory-note transactions in attachments to [Cranney]'s 2015 *pro se* motion to dismiss…" However, Petitioner appears to be referring to Exhibit C to the Memorandum in Support of Motion to Dismiss [#40-3], which includes the same spreadsheets and graphs submitted as Exhibit G to the Petition. Charts and Tables (Exhibit G) 50-73 [#562-1].

2.  <u>Lack of Objections to Evidence of Cranney's Employee Stock Ownership
Plan</u>

Petitioner argues that counsel was ineffective in ensuring that the prosecution complied

with the court's <u>Order</u> [#209] precluding the government from alleging that Cranney's Employee

Stock Ownership Plan ("ESOP")[14] did not comply with federal regulations where he "failed to

object during trial when on multiple occasions the prosecution…elicited damaging, opinionated

testimony that in effect asserted that Defendant's retirement plan was nonconforming with

applicable law and regulation," "failed to object to jurors' access to the Indictment" which

alleges that, "as Cranney well knew, none of the investors was his employee," Indictment 4 [#1],

and "failed to request that Judge Talwani instruct the jury to ignore assertions or suggestions that

the subject ESOP was noncompliant." Pet. 9-11 [#562] (internal emphasis and quotations

omitted).

The court's order, however, was more nuanced than Cranney asserts and did not preclude

the governments' assertions or questions in the manner that Cranney claims. Instead, while the

court ordered that "[t]he government may not allege that defendant's ESOPS/ESOTS did not

comply with federal regulations without identifying the specific regulations purportedly at issue

and seeking reconsideration of this order," the order explicitly:

> does not preclude the government from introducing evidence that: defendant held
> out Cranney Capital I as a qualified retirement plan in which investors could
> participate even though he later claimed to not know what an ESOT is or how an
> ESOT works; Cranney did not try to understand or comply with the ESOP
> regulations on his own but claimed to rely on advice of counsel; Cranney did not
> fully inform his attorney about his operations of Cranney Capital I; [Attorney]
> Christoffers gave Cranney advice Christoffers believed to be consistent with his
> understanding of the applicable statutes and regulations governing ESOPS, and
> that Cranney did not follow the specific advice that Christoffers gave him.

Elec. Ord. [#209]. The order also did not limit access to the Indictment, which is not itself

---

[14] This entity is sometimes referred to as an Employee Stock Ownership Trust ("ESOT").

evidence. Id.

Notably, Petitioner does not specify the statements to which counsel allegedly failed to object, but instead highlights two occasions on which counsel not only did object, but on which those objections were sustained.[15] See Pet. 10 [#562]. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland v. Washington, 466 U.S. 668, 690 (1984). Cranney has not here identified any of the allegedly "multiple occasions" on which counsel improperly "failed to object," see Pet. 11 [#562], and, thus, has not identified any acts or omissions that demonstrate counsel's purported lack of reasonable professional judgment.[16] See Strickland v. Washington, 466 U.S. 668, 690 (1984).

Cranney also fails to show that counsel's failure to object to giving the Indictment to the jury fell below a reasonable standard of professional conduct, let alone that "there is a reasonable probability that…the result of the proceeding would have been different" had counsel objected to the jury's access to that clause in the Indictment. See Strickland v. Washington, 466 U.S. 668, 694 (1984). Indeed, such an argument would not prevail. The First Circuit has held that, "subject

---

[15] Petitioner also criticizes counsel for having "added no comments" to his sustained objections. Pet. 11 [#562]. Speaking objections are, however, disfavored. And as the court noted in its instructions to the jury, "Questions and objections by lawyers are not evidence. Lawyers have a duty to their clients to object when they believe a question is improper under the Rules of Evidence. You should not be influenced by the objection or by my ruling on it." Transcript of Trial Day Eleven 71 [#554].

[16] Respondent construes Cranney's claim as asserting that his trial was unfair as the result of inappropriate testimony and that counsel was ineffective for allowing such testimony to be elicited without objection. Resp.'s Opp'n 10 [#567]. As to the latter, Respondent assumes that the testimony Cranney challenges is that of Paul Christoffers, and argues that because counsel did, in fact, make "appropriate objections to such testimony at trial, Cranney could have raised this as an issue on appeal. Since he did not, he is procedurally defaulted from raising it now." Id. However, as with his other arguments, Petitioner does not directly claim that his trial was unfair as the result of inappropriate testimony, only that he received ineffective assistance of counsel with regard to the handling of witness testimony relating to the ESOP. That claim is not procedurally defaulted. See Massaro, 538 U.S. at 504.

to a proper covering instruction, whether the indictment should be given to the jury for use during its deliberations is within the discretion of the trial court." U.S. v. Medina, 761 F.2d 12, 21-22 (1st Cir. 1985). Here, the jury was twice adequately instructed that the Indictment was not evidence, but merely an accusation, and cannot be considered proof of any charge.[17] See Transcript of Trial Day Eleven 72, 76 [#554]. The court's decision to send the Indictment to the jury was, thus, well within its discretion. Petitioner has similarly not shown that, had counsel raised an objection that did result in the court's redaction of the challenged clause, "there is a reasonable probability that…the result of the proceeding would have been different." See Strickland v. Washington, 466 U.S. 668, 694 (1984). As such, he has not demonstrated that counsel was constitutionally ineffective.

Finally, Petitioner has not overcome the "strong presumption" that counsel's choice not to request that the court instruct the jury to disregard any allegations that the ESOP did not comply with regulations "might be considered sound trial strategy." See Strickland v. Washington, 466 U.S. 668, 689 (1984). Counsel may wisely have concluded such an instruction would only serve to highlight any improper suggestions in the juror's minds. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. Petitioner has not overcome that presumption here.

---

[17] The court instructed: "The Indictment in this case is not evidence. This case, like most criminal cases, began with an Indictment. The Indictment was returned by a grand jury which heard only the government's side of the case without cross-examination of witnesses. The fact that Mr. Cranney has had an Indictment filed against him is no evidence whatsoever of his guilt. The Indictment is simply an accusation. It is the means by which the allegations and charges of the government are brought before the court. The Indictment proves nothing." Transcript of Trial Day Eleven 72 [#554]. It then reiterated: "I remind you that an Indictment is not evidence of any kind against Mr. Cranney. The Indictment is just an accusation in a document filed with the court to bring a criminal charge against the defendant. You will be given a copy of the Indictment to take with you during your deliberations." Transcript of Trial Day Eleven 76 [#554].

3.  <u>Failure to Present Chosen Witnesses</u>

Petitioner argues that counsel "failed to defend Cranney's Sixth Amendment right to choose witnesses and evidence…" Pet. 14 [#562]. His primary complaint is that counsel did not call, or did not sufficiently advocate that he be allowed to call, multiple witnesses who had given Cranney money and who would testify that they "had not been defrauded." <u>Id.</u>

Respondent contends that, on the contrary, "[t]he record belies Cranney's claim." Resp.'s Opp'n 11 [#567]. Indeed, a review of the record reveals that counsel went to great lengths to convince the court that he should be allowed to call and examine the challenged witnesses.

When the government moved to prevent Cranney from calling witnesses who had given money to Cranney and who would testify that they had not been defrauded, <u>see</u> Motion in Limine to Exclude Evidence of Non-Victim Clients [#148], counsel filed a written <u>Opposition</u> [#178]. After the court's <u>Electronic Order</u> [#202] limiting the testimony of "nonvictim"[18] clients,

---

[18] Cranney objects to counsel's adoption of the government's term "nonvictim" and argues that the court might have "rescinded" its initial limitation on that group's testimony "had Budreau made clear that Defendant's witnesses had suffered financial injury." Pet. 13 n.16, 14, 15 [#562]; <u>see also</u> Pet.'s Reply 2 [#598]. However, in counsel's July 15, 2017, <u>Motion for Reconsideration</u> 1 [#292], he objects in the first paragraph that "[t]he government has attempted to distinguish the two groups by referring to those named in the indictment as 'victims' while referring to the others as 'novictims' despite the fact that they both negotiated and received the same financial bargain from Mr. Cranney**.**" Counsel notes that he "refers to these two groups using the government's terms 'victims' and 'nonvictims' for clarity sake. The defense sees these groups as one which have been artificially split up because the 'victims' accepted the government's narrative while the 'nonvictims' did not." <u>Id.</u> at 1 n.1. The motion further argues that "Mr. Cranney seeks to present evidence from other lenders, <u>who also lost money in the same scheme</u>, that they were not induced to participate through false representations despite negotiating and entering into almost identical financial agreements with Mr. Cranney." <u>Id.</u> at 3 (emphasis added). Moreover, "[a]lmost all note holders, regardless of how the government classifies them, suffered losses as a result." <u>Id.</u> at 2 n.3.

Cranney makes a similar objection about the classification of "victims" in response to the government's reference to Trial Exhibit 578, Resp.'s Opp'n 1 n.1 [#567], in response to the court's <u>Order</u> [#564] requiring that the government's response to Cranney's habeas petition "must also include a statement notifying this Court of the existence of any victim or victims as defined by 18 U.S.C. § 3771." Pet.'s Reply 1 [#598].

counsel filed a <u>Motion for Clarification</u> [#210] to better understand the contours of the court's directive and the testimony he would be permitted to elicit. On March 23, 2017, the court explained that "[n]on-victim clients may testify to their transfer of money to, and receipt of money from, the defendant or other entity related to the defendant. They may not testify as to their own understanding of defendant's business or practices, and defendant may not offer their testimony or other evidence as to what defendant stated to them." Elec. Ord. [#213].

On July 15, 2017, counsel filed a thorough <u>Motion for Reconsideration</u> [#292] of the court's <u>Orders</u> [#202; #213] arguing that his client had a Sixth Amendment right to "present an effective defense,"[19] which required elucidating testimony to demonstrate that "Mr. Cranney made the same representations to all funders (government and defense witnesses alike) with the only difference being that some funders are willing to accept the government's narrative that Mr. Cranney defrauded them while others, similarly situated, reject that narrative." Motion for Reconsideration 4-5 [#292]. The court, in response, modified its earlier <u>Order</u> [#213] as follows: "Defendant may offer promissory notes executed by the Defendant and a testifying witness. Said witnesses may not testify as to their own understanding of Defendant's business or practices, and Defendant may not offer their testimony as to what Defendant stated to them." <u>Order</u> [#296].

In an August 18, 2017 email to his attorney, Cranney wrote:

> As you well know, I'm battling on my own to reverse Judge Talwani's devastating order to suppress my witnesses and their exhibits, without your help… If I prevail *pro se* - there are glimmers I will - then we'll take full advantage of the opportunity to examine our highly credentialed witnesses to demonstrate they took their notes seriously, and that no note holder, friend or foe alike, ever complained in the least that his or her notes had been superseded by vaguely described 'pie-in-the-sky' "inducements" of which I'm falsely accused of making.

---

[19] Cranney contends that "Budreau refused to draft or endorse a motion at Cranney's direction supporting his Sixth amendment right to call material witnesses and present material evidence of his choosing." Pet. 14 [#562]. The court notes that counsel raised Sixth Amendment arguments, both orally and in writing, several times over the course of the litigation.

"August 18, 2017, Email from Cranney" (Exhibit K) 77 [#562-1].

Responding later that day, counsel explained: "We can't show that you did not commit the crime with Charters by presenting evidence that you did not make false misrepresentations to the Woodmans. That is not admissible in any court in the country." August 18, 2017, Email from Budreau (Exhibit E) 47 [#562-1].

In advance of trial, in April 2018, counsel filed a further Motion for Clarification [#436] of the previous Order [#296] seeking additional information "as to the scope of permissible testimony by defense witnesses consistent with his right to a fair trial and right to present an adequate and/or effective defense pursuant to the Fifth and Sixth Amendments to the United States Constitution." Motion for Clarification 1 [#436]. The motion included additional argument that "the defense must be permitted to present substantive evidence from lenders to contradict [the government's] theory of prosecution." Id. at 3. The court denied the motion. Elec. Ord. [#441].

At trial, counsel again revisited the scope of permissible testimony, conducting a thorough voir dire of proposed witness Julia Anderson outside the hearing of the jury. Transcript of Day Nine of Jury Trial 7-56 [#551]. He then advocated that she be allowed to testify. Id. at 57-83. The court observed that the parties had established "a record for the Court of Appeals" and ruled that the defense could introduce certain exhibits through Ms. Anderson, and "ask directly whether [she] believe[s] there were misrepresentations made to [her]," but that once she answered no, no further testimony would be permitted. Id. at 83:17-19. After a discussion with Cranney, counsel determined that "the truncated purpose doesn't really assist" the defense and called neither Julia Anderson nor any other witness. Id. at 85:01-05. As the court noted, defense counsel had established through voir dire "a record for the Court of Appeals" to allow the court's

ruling limiting evidence to be challenged. Id. at 83:10-11.

On the eleventh day of the trial, the court invited counsel to "make [his] record" as to the witnesses he intended to call. Transcript of Day Eleven 7:14-16 [#554]. Counsel did so, noting that in addition to Ms. Anderson, counsel would have called "Burt Stillman," "Ms. Woodman," "Mr. and Mrs. DePino," "Mr. Deshler," and "Ken Bradley," all of whom "essentially would say similar things as Ms. Anderson." Transcript of Day Eleven 8:7-12 [#554]. He explained their anticipated testimony would have included an understanding that they had intended the money given to Cranney as loans, and that the promissory notes they received "correctly represented the terms and conditions," and that, although "some of them received money back" and "[s]ome of them didn't," that "they believed that this was a fair…representation of the arrangement they had with Mr. Cranney." Id. at 8:15-22. He stated further that several of them would also have testified about "the arrangement they had with the ESOPs and what Mr. Cranney told them about the ESOPs," including that they were "qualified participants based upon what the lawyer told him." Id. at 8:24-9:05. However, he noted that "the Court would restrict me in a manner where I could not ask them questions about what Mr. Cranney said and what they told each other in advance relative to the financial arrangement, and as a result, I'm not calling them as witnesses." Id. at 9:10-14. He concluded by "renew[ing] [his] request to have them testify" and argued that "the Court's restriction" of his ability to conduct direct examinations "is in violation of [his] client's Sixth Amendment right to present a full defense and his right to a fair trial under the Fifth Amendment." [20] Id. at 9:10-20.

---

[20] Cranney grossly mischaracterizes counsel's sustained effort to convince the court to allow testimony from these witnesses and subsequent creation of a record for appeal as follows: "[S]hortly before trial Budreau unexpectedly canceled all appearances by defense witnesses." Pet.'s Reply 2 [#598].

Although the court did not rule as he advocated, counsel's efforts to call Cranney's desired witnesses and elicit testimony that they did not believe themselves to have been defrauded were persistent and vigorous, easily meeting the bar set in Strickland.

V.      Conclusion

For the foregoing reasons, the Petition for a Writ of Habeas Corpus [#562] is DENIED.

IT IS SO ORDERED.

Date:   January 4, 2021                                        /s/ Indira Talwani
                                                              United States District Judge